IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PENN-DION CORPORATION,

                    Plaintiff,

        v.

GREAT AMERICAN INSURANCE
COMPANY OF NEW YORK, et al.,

                    Defendants.

CIVIL ACTION
NO. 17-4634

**TABLE OF CONTENTS**

I.   **INTRODUCTION** ................................................................................................... 3

II.  **BACKGROUND** ..................................................................................................... 5

     A.   The First Claim ............................................................................................. 6

     B.   Sale of the Building ......................................................................................11

     C.   The Second Claim........................................................................................ 12

     D.   The Third claim............................................................................................ 16

III. **STANDARD OF REVIEW** ................................................................................. 19

     A.   Standard on a Motion to Dismiss Pursuant to Federal Rule of Civil Procedure

          12(b)(6). ...................................................................................................... 19

     B.   Standard on a Motion to Strike Pursuant to Federal Rule of Civil Procedure

          12(f)…...……………………………………………………………….……21

IV.  **ANALYSIS** ........................................................................................................... 21

A.  The Partial Motion to Dismiss Counts I, II, III, VI, and VII

Will Be Granted…………………………………….......................................................22

1.    Plaintiff's Fraud Claims in Counts I and II Will Be Dismissed. ............................... 23

a.    Count I of the Complaint Will Be Dismissed Because the Gist of the Action

Doctrine Bars the Fraud Claim Against Great American........................................ 23

b.    Count II of the Complaint Will Be Dismissed Because Plaintiff Has Not

Established Justifiable Reliance on the Actions of Engle Martin ……………..... 26

2.    Count III will be Dismissed Also Because Engle Martin does not Owe

a Duty to Plaintiff. ................................................................................................... 29

3.    Counts VI and VII Will Be Dismissed Because Neither Defendant

Has Committed  Fraud..... ………..………………………………………………31

a.    Civil Conspiracy…………………………………………………………………32

b.    Concerted Action…………………………………………………………….....32

B.  The Motion to Strike will be Denied Because the Allegations in Paragraph 84

are not Prejudicial...…………………………………...……………………..……...33

V.    **CONCLUSION** ............................................................................................................ 36

<u>**OPINION**</u>

**Slomsky, J.**                                                    **January 31, 2019**

## I.    INTRODUCTION

Plaintiff Penn-Dion Corporation ("Penn-Dion" or "Plaintiff") brought this suit against its insurance provider, Great American Insurance Company of New York ("Great American"), and Engle Martin & Associates, Inc., ("Engle Martin") (collectively, "Defendants"). Engle Martin is a company that provided adjustment services[1] to Great American. Penn-Dion owned a 140-unit apartment building (the "Building") located at 915 Spring Garden Street in Philadelphia, Pennsylvania. The Building included art studios, photographer offices, commercial printing areas, silk screen clothing storage, and sportswear manufacturing and loose-leaf binding space. This dispute arose between the parties when a fire damaged part of the Building. Immediately after the fire, the Philadelphia Department of Licenses and Inspections inspected the Building and issued Plaintiff two notices that collectively contained thirty-six violations of the Philadelphia Building Code ("Code"). As a result, tenants were not permitted to occupy the Building for several weeks.

Due to fire damage, Code violations and resulting loss of business, Plaintiff made several claims under its insurance policy with Great American. To investigate these claims and determine the value of Plaintiff's loss, Great American retained Engle Martin. Engle Martin did its investigation and determined that the fire damage was covered under the insurance policy, but took the position that damage or loss associated with Code violations was not covered. The company provided Great American with a damage estimate, which it computed after considering several factors, including replacement cost value, actual cash value, and a twenty-percent depreciation rate on the cash value of the items affected by the damage. Engle Martin revised this estimate several

---

[1] Great American hired Engle Martin to investigate the damage to Plaintiff's Building and determine the appropriate payout amount under its insurance policy.

times before Great American gave it to Plaintiff to settle the claim. Plaintiff also hired its own adjuster and obtained separate estimates, which differed from Engle Martin's estimate.

Plaintiff hired its own insurance adjuster, whose damage estimate included the cost of Code upgrades, unlike Engle Martin's estimate. This estimate was much higher than Engle Martin's estimate. After Penn-Dion submitted its repair estimates to Great American and Engle Martin, the insurance company increased the estimated payout amount by now including Code upgrades. But it also increased the depreciation rate. Plaintiff claims that the increased depreciation rate, used at the time without explanation, had the overall effect of reducing the payout under that estimate. Nevertheless, Plaintiff accepted Great American's payout offer of $48,682 for the undisputed fire damage and Code upgrades.

Thereafter, Penn-Dion filed a second claim based on loss in value to undamaged parts of the Building. These parts would be affected by the Code upgrades. A third claim based on resulting loss of business income and extra expenses was also submitted. Finding no support in the policy for the second and third claims, Great American denied both claims.

Plaintiff alleges in this case that Great American and Engle Martin acted fraudulently, individually and together, to structure their estimates to withhold money that Plaintiff was entitled to receive under its policy. It seeks to recover damages from both Defendants. The Complaint filed against them alleges fraud against Great American (Count I), fraud against Engle Martin (Count II), negligence against Engle Martin (Count III), breach of contract against Great American (Count IV), bad faith against Great American (Count V) and civil conspiracy and concerted action under the Restatement (Second) of Torts § 876 against both Defendants (Counts VI and VII). (Doc. No. 28.)

On August 22, 2017, Plaintiff filed this case in the Court of Common Pleas of Philadelphia County. Defendants timely removed the action to this Court based on diversity of citizenship jurisdiction. Before the Court is Defendants' Partial Motion to Dismiss and Strike Plaintiff's Third Amended Complaint (Doc. No. 29), Plaintiff's Response in Opposition (Doc. No. 31), and Defendants' Reply (Doc. No. 32). Defendants seek to dismiss Counts I, II, III, VI, and VII and strike Paragraph 89 of the Complaint. For reasons discussed _infra_, Defendants' Partial Motion to Dismiss and Strike the Third Amended Complaint (Doc. No. 29) will be granted in part and denied in part.

## II.     BACKGROUND

Penn-Dion is a Pennsylvania corporation that is engaged in commercial real estate. (Doc. No. 28 ¶ 1.) Its only asset is a building located at 915 Spring Garden Street, Philadelphia, Pennsylvania (the "Building"). (Id. ¶ 4.) The Building was used for several purposes, including office space, art studios, and equipment storage. (Id. ¶ 5.) It was insured under a commercial policy with Defendant Great American, an insurance company organized under the laws of New York. (Id. ¶ 13.)

On September 2, 2015, a fire damaged two rooms in the Building. (Id. ¶ 7.) As a result, the Philadelphia Department of Licensing and Inspections ("L&I") required tenants to evacuate. (Id.) The next day, L&I inspected the Building and issued a notice citing three Code violations relating to its Certificate of Occupancy[2]. (Id. ¶¶ 8, 40; id. at 39-41.) After further investigation, in a separate notice, L&I issued thirty-three additional Code violations and prohibited tenants from returning to their spaces until the violations were remedied. (Doc. No. 28 ¶ 9; id. 37-51.)

---

[2]  Plaintiff contends that this violation was issued "wrongfully." (Id.) The Complaint and accompanying exhibits, however, do not support this assertion and the Department of L&I does not admit that the violation was wrongfully issued.

According to Plaintiff, on October 5, 2015, L&I issued a Certification Statement which confirmed that the use of the Building was proper, and that the violations issued previously were erroneous.[3] (Doc. No. 28 ¶ 12; id. at 54-63.)

After the fire, Plaintiff filed several insurance claims under its policy with Great American. It sought reimbursement for repairs due to fire damage, the cost of construction necessary to bring the Building in compliance with Philadelphia Codes, and for business loss and extra expenses. (Doc. No. 28 at 64-156; Doc. No. 28-1 at 1-39.) Plaintiff believed its claims were compensable and that Great American was responsible to pay the claims because it "knew or should have known of the condition of the Building on date of loss when it provided insurance for Code upgrades and accepted additional premiums . . . ." (Doc. No. 28 ¶ 14.)

In turn, Great American contracted with Defendant Engle Martin, an insurance adjustment company, to investigate Plaintiff's loss and to determine a payout amount.[4] (Id. ¶ 18.) Plaintiff retained its own adjuster, Richard Cohen ("Cohen") to represent its interest. (Id. ¶ 34.) On July 5, 2016, Joe Markham ("Markham"), an adjuster with a different company, replaced Cohen. (Id. ¶ 51.)

### A.    The First Claim

Plaintiff first filed a claim for a payment due to fire damage and Code upgrades under the following provision of its insurance policy:

Ordinance or Law

---

[3]    Exhibit D, which Plaintiff cites in support of this allegation, is a document from the City of Philadelphia Department of L&I, titled "Certification Statement." (Doc. No. 28 at 54-63.) This document was issued on October 5, 2015, about a month after the original notices containing thirty-six violations were issued. Its content shows that L&I had thirty-four uncorrected violations open on this date. Therefore, this document does not support Plaintiff's allegations that previous violations were issued in error. (Id. ¶ 12.)

[4]    Plaintiff never entered into a contract with Engle Martin. (Doc. No. 28 ¶ 19.)

a. Each of the Coverages - Coverage A[5], Coverage B[6], and Coverage C[7] applies only if that Coverage(s) is chosen by entry in the Declarations and then only with respect to the Building property identified for that Coverage(s) in the Declarations.

b. Application of Coverage

The coverage provided by this Optional Coverage applies only if both (1) and (2) are satisfied and then subject to the qualifications set forth in (3).

(1) The ordinance or law:

(a) Regulates the construction or buildings, or demolition, repair or establishes zoning or land use requirements at the described premises; and

(b) Is in force at the time of loss.

But coverage under this Optional Coverage applies only in response to the minimum requirements of the ordinance or law. Losses and costs incurred in complying with recommended actions or standards that exceed actual requirements are not covered under this Optional Coverage.

(2)

(a) The Building sustains direct physical damage that is covered under this policy and such damage results in enforcement of the ordinance or law; or

(b) The building sustains both direct physical damage that is covered under this policy and direct physical damage that is not covered under this policy, and the building damage in its entirety results in enforcement of the ordinance or law.

---

[5] Coverage A applies to loss in value to an undamaged part of a Building that needs to be demolished in order to comply with a law or ordinance. (Doc. No. 28-1 at 79-89.)

[6] Coverage B applies to costs for demolishing undamaged parts of the Building in order to comply with a law or ordinance. (Id.)

[7] Coverage C applies to the cost to either repair or reconstruct damaged parts of a Building or remodel undamaged parts of the Building in order to comply with an ordinance or law. (Id.)

(c) But if the building sustains direct physical damage that is not covered under this policy, and such damage is the subject of the ordinance or law, then there is no coverage under this Optional Coverage even if the building has also sustained covered direct physical damage.

(3) In the situation described in (2)(b) above, we will not pay the full amount of loss otherwise payable under the terms of Coverages A, B, and/or C of this Optional Coverage. Instead, we will pay a proportion of such loss; meaning the proportion that the covered direct physical damage bears to the total direct physical damage.

However, if the covered direct physical damage, alone, would have resulted in enforcement of the ordinance or law, then we will pay the full amount of loss otherwise payable under the terms of Coverages A, B and/or C of this Optional Coverage.

(Doc. No. 28 ¶ 16, id. at 114.)

With respect to undamaged parts of the building, the policy further provides:

d. Coverage

1) Coverage A – Coverage for Loss to the Undamaged Portion of the Building

With respect to the building that has sustained covered direct physical damage, we will pay under Coverage A for the loss in value of the undamaged portion of the building as a consequence of enforcement of an ordinance or law that requires demolition of undamaged parts of the same building.

Coverage A is included within the Limit of Insurance shown in the Declarations as applicable to the covered building. Coverage A does not increase the Limit of Insurance.

(Doc. No. 28 at 114.)  In the following section, titled "Loss Payment," the policy states, in relevant part:

1) All following loss payment Provisions e.(2) through e.(4), are subject to the apportionment procedures set forth in Section b.(3) of this Optional Coverage.

2) When there is a loss in value of an undamaged portion of a building, to which Coverage A applies, the loss payment for that building,

including damaged and undamaged portions, will be determined as follows:

(a) If the replacement cost value applies, and the property is being repaired or replaced, on the same or another premises, we will not pay more than the lesser of:

    (i) The amount you would actually spend to repair, rebuild or reconstruct the Building property, but not for more than the amount it would cost to restore the Building property on the same premises and to the same height, floor area, style and comparable quality of the original property insured; or

    (ii) The Limit of Insurance shown in the Declaration as applicable to the covered Building property.

(b) If the replacement cost valuation applies and the property is not repaired or replaced, or if the replacement cost valuation does not apply, we will not pay more than the lesser of:

    (i) The actual cash value of the Building property at the time of loss; or

    (ii) The Limit of Insurance shown in the Declarations as applicable to the covered Building property.

(Doc. No. 28 ¶ 16; id. at 115.)

On September 8, 2015, Engle Martin employee, Matthew Cericola ("Cericola"), inspected the Building and decided that damage caused by the fire was covered under the policy. (Doc. No. 28 ¶¶ 21, 22.) His initial estimate ("Initial Estimate") consisted of a replacement cost value[8] ("RCV") of $18,682.15 and an actual cash value[9] ("ACV") of $16,155.46. (Id. ¶ 23.) The latter

---

[8] Replacement cost value is calculated by using the original price for the items lost.

[9] Actual cash value is the amount it would cost to repair or replace property covered under the policy at the time of loss or damage, with material of like kind and quality, subject to a deduction for deterioration, depreciation and obsolescence. (Doc. No. 28 at 69.)

estimate factored in a depreciation rate of twenty-percent on depreciable items affected by the damage, and did not include the cost of Code upgrades.  (Id. ¶¶ 23, 24.)

On October 2, 2015, after Cericola evaluated the damage, Great American employee Matt Beaver ("Beaver") emailed Cericola a newspaper article about the fire and opined that the Code violations do not relate to the fire.  (Id. ¶ 27.)  Beaver suggested that it "may be beneficial to send the article to [Plaintiff] and ask if a claim is being made for the Code violations or the business income loss."  (Id. ¶ 29)  He stated, "[i]f so, we will need to advise the insured of our coverage concerns in this regard."  (Id.) (alteration in original.)  That day, Cericola emailed Plaintiff's President stating: "I have reviewed the attached article and see that the code violations are not related to the fire and the reason the artists/tenants have been denied entry is not the fire, but the code issues."  (Id. ¶ 31.)  He also noted "[b]ased on the attached article it appears any lost income would be a direct result of the code violations and not the fire that damaged the one studio."  (Id. ¶ 32.)

On October 5, 2015, L&I issued another Certification Statement listing thirty-four violations of the Code.[10]  Although this document was silent on whether tenants could reenter the Building, Plaintiff interpreted this document to acknowledge that the Building's regular use was permitted again.[11]  (Id. ¶¶ 12, 33; Doc. No. 28-1 at 40-49.)

---

[10]  Exhibit F, which Plaintiff cites regarding this allegation, is a document dated October 5, 2015. It shows that on this date, thirty-four violations were uncorrected.  In the Complaint, Plaintiff alleges that this document listed twenty-nine uncorrected violations.  (Doc. No. 28 ¶ 33; Doc. No. 28-1 at 40-49.)

[11]  The record contains no evidence that the Building was repaired or that the Code violations were remedied.  Plaintiff does not explain why tenants were permitted to reenter the Building at this point.

On January 7, 2016, Plaintiff obtained the following repair estimates from Doozer Construction ("Doozer"): (1) $40,689 to repair property damaged by the fire, and (2) a separate estimate of $27,539 for Code upgrades required for the restoration of the affected areas. (Doc. No. 28 ¶ 37; Doc. No. 28-1 at 50-60.) After reviewing Doozer's estimates, Cericola revised Great American's payout estimate to cover both amounts as follows: RCV of $53,746 and ACV of $47,417.33. (Doc. No. 28 ¶ 38.) This revised estimate increased the payout amounts, included Code upgrades (Id. ¶ 39) and applied a forty percent depreciation rate to determine ACV, which was twenty percent higher than the previous rate. (Id. ¶ 40.) Penn-Dion believes that Defendants jointly agreed to manipulate the depreciation rate to determine the ACV for the sole purpose of reducing the claim payout. (Id. ¶ 41.) When Cohen expressed this concern to Cericola on Plaintiff's behalf, Cericola revised the estimate again, reducing the depreciation rate to thirty-three percent. (Id. ¶¶ 43-44.) Neither Great American nor Martin Engle has explained the reasons for the fluctuation in the depreciation rate used to determine ACV or how they calculated the ACV and RCV to result in an offer of $48,682 to Plaintiff on its first claim. (Id. ¶ 45.)

Despite disagreeing with the accuracy of the payout amount, Plaintiff accepted on March 7, 2016 a payment of $48,682 from Great American for Building damage and Code upgrades. (Id. ¶ 48.)

**B.     Sale of the Building**

Before fire damaged the Building, Plaintiff had entered into an agreement on July 29, 2015 to sell the company and the Building, its only asset, for the sum of $7,760,000 dollars. ("First Agreement of Sale.") (Id. ¶ 9.) Months later, after the fire, the buyer exercised its right to terminate the First Agreement of Sale due to the anticipated cost to bring the Building up to Code and obtain

a new certificate of occupancy.[12]  (Id. ¶ 35.)  On July 1, 2016, while conversations about the claims with Great American were ongoing, Plaintiff entered into another agreement to sell the Building to YESS Management, Inc. for $6,500,000 dollars.  (Id. ¶ 50.)  On December 14, 2016, the Building was sold.  (Id. ¶ 65.)  Thereafter, Plaintiff continued to pursue its claims with Great American.

### C.    The Second Claim

While represented by adjuster Joseph Markham, Plaintiff filed its second claim with Great American based upon the "Ordinance or Law" coverages A, B, & C and "Business Income" and "Extra Expense" sections of the policy.  (Id. ¶ 53; Doc. No. 28-1 at 75-77.) [13]

The section of the policy provides in relevant part:

> With respect to the building that has sustained covered direct physical damage, we will pay under Coverage A for the loss in value of the undamaged portion of the building as a consequence of enforcement of an ordinance or law that require demolition of undamaged parts of the same building.

(Id. at 51,76.)

In a letter to Cericola, Markham explained:

> As we discussed much of undamaged portion of the [B]uilding will have to be brought into compliance with the current building code requirements for light industrial usage before a Certificate of Occupancy can be obtained.  As such, we are looking to be reimbursed for these undamaged portions of the [B]uilding under. . . Coverage A . . . .

(Id. at 76-77.)  Specifically, the second claim sought reimbursement for the following items:

---

[12]    In the Complaint, Plaintiff initially states that the First Agreement of Sale was entered into on July 29, 2015.  (Doc. No. 28 ¶ 6.)  Later, it refers to the First Agreement of Sale being executed on July 15, 2015. (Id. ¶ 35.)

[13]    Plaintiff also submitted a third claim for business interruption and extra expenses discussed infra.

1. All partitions containing combustible materials.

2. Passenger elevators without fire rated shaft walls.

3. One of the exterior mounted, iron fire escapes.

4. Toilet facilities that must become both gender specific and ADA complaint on all floors.

5. Ceiling and floor structural components that will have to be removed to extend an additional stair tower from the 3rd to the 5th floor.

6. All non-rated doors and jambs that access fire escapes routes throughout the building.

7. Multiple electrical service taps that currently supply the building with electricity.

8. Electric service switchgear and distribution equipment that is incompatible with the new single service entry equipment.

9. Circuit wiring and cabling utilizing non-compliant insulating material.

10. All non-compliant panels, disconnects and distribution equipment.

(Id.)

In support of this claim, Markham sent to Cericola architect reports that addressed the need for these items. (Doc. No. 28 ¶ 52.) Great American denied the claim. (Id. ¶ 56.)

In a letter to Markham, Beaver, the Great American representative, explained his reason for denial as follows:

> The Select Business Policy Building and Personal Property Coverage Form initially excludes loss or damage caused directly or indirectly by the enforcement of any ordinance or law as it relates to the construction or repair to covered property due to a covered cause of loss.
>
> However, your policy does include an optional coverage for Ordinance and Law Coverage . . . which only applies if a limit of insurance is included on the Select Business Policy Enhanced Plus Declarations. I have enclosed a copy of the

Declarations which confirms that you have purchased the additional coverage for Ordinance and Law- Coverages A, B and C.

(Doc. No. 28-1 at 78-79.) Beaver further explained that the policy provision that Markham cited

to applied as follows:

[The Ordinance and Law Coverage A – Undamaged Portion section of the policy] is for loss to the undamaged portion of the building and does not apply to your fire damage loss. This coverage is specifically for the loss in value of the undamaged portion of the building as a consequence of enforcement of an ordinance or law that requires demolition of undamaged parts of the same building. Worded another way, there is no ordinance or law enforcement involved here as it relates to the undamaged parts of your building. This coverage would be applicable if for example the remaining undamaged parts of your building had to be demolished. Your basic coverage and building limit responds to the fire damage repairs, and then the loss in value of the remaining of the building (which are undamaged by fire) would be coved under this Optional Coverage, if they were required to be demolished due to the enforcement of an ordinance or law. As the undamaged parts of your building do not have to be demolished there is no loss in value to the undamaged parts and Ordinance and Law Coverage A will not apply to this claim.

(Id.) In this letter, Beaver also explained that its payout of $48,682.00, previously accepted by

Penn-Dion, included cost for code upgrades. He wrote:

Previously, Great American issued payments totaling $27,539.56 under Coverage C, meaning $72,460.44 of the policy remains for code items related to the Increased Cost of Construction should it be confirmed that additional Ordinance or Law items are required as part of the repair/reconstruction process. Please note that payments were issued for this portion of the loss as it was my understanding that the repairs were going to be completed. Any future payments for Ordinance Law will only be issued after the work has been completed and the cost has been incurred.

(Id.) Markham disagreed with Great American's interpretation of the policy. In a letter dated

August 12, 2016, he responded:

The policy provides; [sic] as long as part of the undamaged portion of the building requires demolition the insured is entitled to the loss of value of the Building (see section e. loss payment). Additionally, even if Great American's position is correct, which is disputed, it is suggested that most of the code upgrades will require removal of old systems that would be considered demolition. As an example, in order to replace the pre loss [sic] electrical system with a code compliant system the old system would need to be removed (demolished) which according to Great

American's position would trigger Great American's obligation to pay loss of value of the Building.

Additionally, Coverage A references the insured being entitled to loss in value, as opposed to cost to construct undamaged portions. The policy does not define "loss of value". If the policy does define loss of value please reference the section in the policy that defines the term. Request is made that Great American explain how it interprets the term loss of value as it relates to this claim, coverage, claim valuation and claim payment. . . . Please indicate with specificity the relationship of loss of value to Replacement Cost and or Actual Cash Value.

. . .

We contend that Section E (2) (b) allows recovery of loss of value without requirement of repair to the undamaged portion of the Building. Please confirm you agree that payment of a claim for Ordinance and Law (section A) is governed by this section and does not require actual repair. I suggest that pursuant to Section E (2) (b) the loss of value to the building could be as much as the limit of liability, $9,000,000.00. I bring this to your attention as you may wish to re-evaluate your current reserve on this loss.

(Id. at 90-94.)

Beaver explained that "most, if not all, of the items [for which Plaintiff seeks reimbursement] related to the requirements needed to secure a Certificate of Occupancy as opposed to the expenses associated with completing the fire damage repairs . . . " and it did not see a loss of value for part of the Building or the entire Building because of the noncompliant components that existed at the time of the fire. (Doc. No. 28 ¶ 58; Doc. No. 28-1 at 95-97; Doc. No. 28-2 at 1-9.) Stated another way, Great American disagreed that there was a "loss of value to the Building as all of the non-compliant building components and systems existed at the time of loss, and while the City of Philadelphia may have ordered the premises to be vacated because of these non-compliant [B]uilding items, since these items existed prior to the loss, [it] did not see a loss of value claim for the [B]uilding under Ordinance or Law- Coverage A." (Doc. No. 28 ¶ 59.)

On October 25, 2016, Markham submitted a revised estimate to Beaver, citing the same section of the policy, and reiterating why the Code upgrade costs should be covered. (Id. ¶ 61.)

Markham explained to Beaver that the damaged electrical circuitry in the fire area could not be repaired because of limitations with the existing electrical system. (Id. ¶ 62.) Thus, the entire electrical system was unusable because of the fire and needed to be replaced. (Id.) Great American did not respond or change its position.

In another letter dated September 10, 2017, Beaver elaborated on its reasons for denial of the claim, as follows:

> . . . the estimate does not appear to include an estimated repair cost for each of the violations outlined in [the] assessment. As it does not appear all of the violations are accounted for in your estimate, there is a concern from [sic] Great American's behalf that even if all the repairs outlined in the estimate were completed, access to the building would still not have been granted by the City of Philadelphia.
>
> Additionally, Great American does not agree with the estimate as presented as there are numerous items that are unrelated to direct physical damage to the building. The cover page for the estimate also indicates that the estimate does not include any of the following:
>
> - Emergency Work
> - Demolition of undamaged, non-compliant building components
> - Content manipulation
> - Code Upgrades (Ordinance or Law)

(Doc. No. 28-2 at 21-22.)

### D. The Third claim

On June 7, 2017, Markham submitted a business income and expense claim of $500,808.71 for business interruption and $52,161.20 for extra expenses under the following policy provision:

> The amount of Business Income loss will be determined based on:
>
> a. the Net Income of the Business before the direct physical loss or damage occurred;
> b. the likely Net Income of the business if no physical damage loss or damage occurred but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

c. the operating expenses, including pay - roll [sic] expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

d. other relevant sources of information, including:

(1) your financial records and accounting procedures;
(2) bills, invoices and other vouchers; and
(3) deeds, liens, or contracts,
(4) The amount of Extra Expense will be determined based on:

a. All expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

(1) the salvage value that remains of any property bought for temporary use during the "period of restoration," once "operations" are resumed; and

(2) any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions, and provisions as this insurance; and

b. Necessary expenses that reduce the Business Income loss that otherwise would have been incurred.

(Doc. No. 28 ¶ 17; Doc. No. 28-2 at 14-16.)

Markham explained to Beaver several factors that he considered when filing the Third Claim. The claim was submitted in response to and related to the fire because the City of Philadelphia prohibited the Building's use until it was brought into full compliance with the Code. (Doc. No. 28 ¶ 68.) In order to bring the Building into compliance with the Code, Plaintiff had to demolish the existing electrical system and other non-damaged parts of the Building, replace most of the electrical systems, and perform extensive upgrades to the Building's life safety systems. (Id.) Considering land usage, permitting, architectural and engineering required to complete these jobs, it was expected that a complete restoration of the property would have taken between 18 to 24 months to complete. (Id.) Additionally, instead of performing the necessary construction to bring the Building into compliance with the Codes, Plaintiff sold the property "as is," thereby

selling it at a lower price due to the damage and violations. (Id. ¶ 69.) All of these factors contributed to the business loss figure that he submitted.

Great American did not agree and denied the claim. (Id. ¶ 71; Doc. No. 28-2 at 17-19.) Nevertheless, upon consideration of Plaintiff's outstanding claims, it offered to settle all claims for $40,000, given Plaintiff's financial information. (Doc. No. 28-2 at 21-22.) Believing it was a partial payout, Plaintiff initially agreed to accept the amount. (Id. at 31-32.) When Defendants clarified that the offer was contingent upon releasing the claim, Plaintiff no longer agreed. (Id. at 33-34.) Great American did not pay Plaintiff to settle its claim.

On August 22, 2017, Plaintiff filed suit in the Court of Common Pleas of Philadelphia County. (Doc. No. 1 at 1.) Defendants removed the case to this Court. (Id.) In the Third Amended Complaint, as noted previously, Plaintiff alleged the following claims against Defendant Great American: in Count I, fraud; in Count IV, breach of contract; and in Count V, bad faith. Against Engle Martin, it alleged: in Count II, fraud and in Count III, negligence. Also alleged were the following counts that apply to both Defendants: Count VI, civil conspiracy, and in Count VII, Concerted Action.

Defendants filed a Partial Motion to Dismiss and Strike Plaintiff's Third Amended Complaint. (Doc. No. 28.) First, they seek to dismiss the following counts: Counts I and II, which allege fraud against Defendants Great American and Engle Martin; Count III, which alleges negligence against Engle Martin; and Counts VI and VII, which alleges civil conspiracy and concerted action against both Defendants. (Doc. No. 28.) Second, Defendants move to strike Paragraph 84 of the Complaint, which provides:

> The actions of Defendants described above were in violation of the following provisions of the Unfair Insurance Practices Act, 40 P.S. 1171.1 et seq, violations of which constitute evidence of bad faith under 42 Pa. C.S.A. [S]ection 8371 and fraud.

a.  Making, issuing, publishing or circulating in any manner an advertisement, announcement or statement containing any representation or statement with respect to the business of insurance or with respect to any person in the conduct of his insurance business which is untrue, deceptive or misleading.   42 P.S. 1171.1(5)(a)(2).

b.  Misrepresenting pertinent facts or policy or contract provisions relating to coverages at issue. 42 P.S. 1171.1(5)(a)(10)(i).

c.  Refusing to pay claims without conducting a reasonable investigation based upon all available information. 42 P.S. 1171.1(5)(a)(10)(vi).

d.  Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which the company's liability under the policy has become reasonably clear. 42 P.S. 1171.1(5)(a)(10)(vi).

e.  Compelling persons to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts due and ultimately recovered in actions brought by such persons. 42 P.S. 1171.1(5)(a)(10)(vii).

f.  Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application. 42 P.S. 1171.1(5)(a)(10)(viii).

(Doc. No. 28 ¶ 84.)  The Motions are ripe for disposition and will be discussed next.

## III.   STANDARD OF REVIEW

### A.  Standard on a Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6).

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009).  After Iqbal, it is clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss.  Id. at 678; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).  "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  Tatis v. Allied Interstate, LLC, 882 F.3d 422, 426 (3d Cir. 2018) (quoting Iqbal, 556 U.S. at 678).  Facial plausibility is "more than a

sheer possibility that a defendant has acted unlawfully." Id. (quoting Iqbal, 556 U.S. at 678). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Iqbal, 556 U.S. at 678).

Applying the principles of Iqbal and Twombly, the Third Circuit in Santiago v. Warminster Township, 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a Rule 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (quoting Iqbal, 556 U.S. at 675, 679). The inquiry is normally broken into three parts: "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Phillips v. County of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (alteration in original) (citation omitted). The "plausibility" determination is a

"context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

### B. Standard on a Motion to Strike Pursuant to Federal Rule of Civil Procedure 12(f).

Pursuant to Federal Rule of Civil Procedure 12(f), upon a motion by either party, the "court may strike from a pleading ... any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f) [14]. The purpose of a Rule 12(f) motion to strike is to "clean up the pleadings, streamline litigation, and avoid the unnecessary forays into immaterial matters." United States v. Educ. Mgmt. Corp., 871 F. Supp. 2d 433, 460 (W.D. Pa. 2012). A matter is immaterial if it has no essential or important relationship to the claim for relief. Nelson v. Bender, No. 3:15-64, 2015 U.S. Dist. LEXIS 163619 at *11 (W.D. Pa. December 7, 2015).

Although courts possess considerable discretion in disposing of a motion to strike under Rule 12(f), "striking a pleading is a 'drastic remedy' to be used sparingly because of the difficulty of deciding a case without a factual record." BJ Energy LLC v. PJM Interconnection, LLC, Nos. 08-3649 and 09-2864, 2010 U.S. Dist. LEXIS 36969 (E.D. Pa. April 13, 2010).

## IV. ANALYSIS

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendants seek to dismiss Counts I, II, III ,VI and VII of the Complaint. They also move to strike Paragraph 89 of the Complaint under Fed. R. Civ. P. 12(f).

---

[14] Fed. R. Civ. P. 12(f) provides: [t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent or scandalous matter. The Court may act (1) on its own; or (2) on a motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

**A. The Partial Motion to Dismiss Counts I, II, III, VI and VII Will Be Granted.**

Both Defendants contend that Plaintiff's fraud claims against each of them fails. First, Great American claims that Plaintiff's fraud claim in Count I is barred by the gist of the action doctrine. (Doc. No. 29-1 at 4-6.) Under this doctrine, a tort claim, which is based on a party's actions while carrying out a contractual agreement, "is barred when the gist or gravamen of the cause of action . . . although sounding in tort, is, in actuality, a claim against the party for breach of its contractual obligations." Downs v. Andrews, 639 Fed. App'x. 816, 819 (3d Cir. 2016) (omission in original) (quoting Bruno v. Erie Ins. Co., 106 A.3d 48, 53 (Pa. 2014)).

Second, Defendant Engle Martin argues that Plaintiff cannot support its fraud claim in Count II because Plaintiff cannot establish a certain element of fraud. To establish fraud, Plaintiff must show that Engle Martin: (1) made a misrepresentation; (2) known to be false; (3) intended to induce action; (4) Plaintiff justifiably relied on the misrepresentation; and (5) was damaged as a proximate result of the misrepresentation. Devon Drive Lionville, LP v. Parke Bancorp, Inc., No. 2:15-3435, 2016 U.S. Dist. LEXIS 179635 (E.D. Pa. Dec. 29, 2016). Specifically, Defendants challenge the justifiable reliance requirement. (Doc. No. 29-1 at 6-7.)[15]

Next, Engle Martin asserts that Plaintiff's negligence claim in Count III fails because as an independent adjuster of Great American, Engle Martin did not owe a duty to Plaintiff. (Id. at 7-8.)

Finally, Defendants claim that since Plaintiff failed to establish tortious conduct under Counts I to III, the conspiracy and concerted action claims in Counts VI an VII should be dismissed. (Id. at 8-9.)

---

[15] Engle Martin cannot seek dismissal under the gist of the action doctrine because it had no contractual relationship with Plaintiff.

1. **Plaintiff's Fraud Claims in Counts I and II Will Be Dismissed.**

   a. **Count I of the Complaint Will Be Dismissed Because the Gist of the Action Doctrine Bars the Fraud Claim Against Great American.**

The gist of the action doctrine exists to "maintain the conceptual distinction between breach of contract claims and tort claims." KZB Commc'ns Inc. v. CBE Techs. LLC, 634 Fed. App'x. 908, 910 (3d Cir. 2015) (quoting eToll, Inc. v. Elias/Savion Advert., Inc., 811 A.2d 10, 14 (Pa. Super. Ct. 2002)). The gist of the action doctrine precludes tort claims: (1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract. Id.

In deciding whether the doctrine applies, a court must identify the nature of the duty breached. Id. The nature of the duty "is the critical determinative factor" as to "whether the claim is truly one in tort, or for breach of contract." Id. (quoting Bruno, 106 A.3d at 68 (Pa. 2014)). The nature of the duty is "established by the underlying averments supporting the claim in a plaintiff's complaint." Bruno, 106 A.3d at 68. As such, the substance of a plaintiff's allegations "are of paramount importance, and, thus, the mere labeling by the plaintiff of a claim as being a tort . . . is not controlling." Downs, 639 Fed. App'x. at 819 (omission in original) (quoting Bruno, 106 A.3d at 68).

If the facts alleged demonstrate that the duty breached was one created by the terms of the parties' contract, then the claim is one for breach of contract. Bruno, 106 A.3d at 68. Put another way, the claim is one for breach of contract if the duty is a promise to do something that the party would not have been obligated to do but for the contract. Id. By contrast, the claim is a tort if the facts establish "that the claim involves the defendant's violation of a broader social duty owed to

all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract." Id. To state a tort claim where a contract exists, the wrong alleged must be the gist of the action, with the contract only incidental. Id. at 66.

Here, in Count I, Plaintiff contends that Great American engaged in fraud by doing the following:

a. Providing an initial estimate that did not include code upgrade costs.

b. Stating, on October 2, 2015, that "the code violations were not related to the fire and the reason the artists/tenants have been denied entry is not the fire but the code issues."

c. Stating, on October 2, 2015, that any lost income would be a direct result of the code violations and not the fire that damaged the one studio. [sic]

d. Using in its revised estimate of February 2, 2016, a 40 percent depreciation rate instead of a 20 percent depreciation rate applied in the first estimate.

e. Using, on February 5, 2016, after Plaintiff's public adjuster pointed out the increased depreciation rate, a 33 percent depreciation rate instead of a 20 percent depreciation rate applied in the first estimate.

f. Denying coverage, on July 25, 2016, under Ordinance and Law Coverage A-Undamaged Portion, while contending that 'as the undamaged parts of your building do not have to be demolished there is no loss in value to the undamaged parts of the building and Ordinance and Law Coverage A will not apply to this claim.'

g. Denying the code upgrade claim, on September 11, 2016, on the ground that 'most, if not all of the items relate to requirements needed to secure a Certificate of Occupancy as opposed to the expenses associated with completing fire damage repairs.'

h. Denying the code upgrade claim, on September 11, 2016, on the ground that 'the policy provides coverage under Ordinance or Law for cost associated with completing the repairs and does not cover the cost of complying with recommended actions or standards that exceed the actual requirements for completing the repairs.'

i. Denying the code upgrade claim, on September 11, 2016, on the ground that Great American 'did not agree that there is a loss of value to the building as all of the non-compliant building components and systems existed at the time of loss,

and while the City of Philadelphia may have ordered the premises to be vacated because of these non-compliant building items, since these items existed prior to the loss, [Great American] did not see a loss of value claim for the building under Ordinance or Law – Coverage A."

j.  Denying the code upgrade claim again on January 11, 2017, and contending that "we are unclear how you contend the covered damage resulted in enforcement of the minimum requirements of an ordinance or law.'

k.  Contending, on July 14, 2017, that is was 'having trouble reconciling numbers of the profit and loss statements from the rent rolls."

l.  Falsely stating that its $40,000.00 offer was not calculated when it had accepted the Doozer estimate for code upgrades.

m. Refusing to pay unconditionally the $40,000.00 amount not in dispute.

(Doc. No. 28 ¶ 89) (alteration in original).

Plaintiff uses the labels "fraud" and "fraudulent conduct" in asserting that these allegations show a breach of duty imposed by law as a matter of social policy, specifically the societal duty not to affirmatively mislead or advise without factual basis.  (Doc. No. 31-2 at 2-6.)  But, the crux of Plaintiff's fraud claim, however, is that Defendant falsely generated payout estimates and made misleading statements about its decisions on Plaintiff's claims for Code upgrades, business income loss and extra expenses.  These are not factual averments demonstrating that Great American breached any social duty beyond the obligations of the contract.  In fact, Penn-Dion's factual averments demonstrate only that the alleged duty breached was created by the contract.  This obligation to evaluate claims and produce estimates to the insured arises from the contract itself.  Each of the alleged wrongdoings, (i.e., denying coverage, evaluating claims, generating estimates) resulted from the obligations under the contract.  But for the contract to provide insurance coverage, the parties had no dealings with each other.  Although Plaintiff has alleged that the actions Great American took in enforcing its contract were fraudulent, Great American had every

right to assert a defense to the claims. Labeling them as fraud or fraudulent does not undermine the fact that these actions taken here arise under the contract of insurance.

For this reason, the Court will dismiss the fraud/misrepresentation claim alleged in Count I under the gist of the action doctrine.

### b. Count II of the Complaint Will Be Dismissed Because Plaintiff Has Not Established Justifiable Reliance on the Actions of Engle Martin.

As noted, Defendants also assert that Plaintiff's fraud claim against Engle Martin fails because it does not establish justifiable reliance. In response, Plaintiff argues that it adequately pled the element of justifiable reliance by stating in the Complaint, "[a]s a result of Plaintiff's justifiable reliance upon Defendants' material misrepresentations, Plaintiff has suffered damages of at least $3,973,351, as detailed in Mr. Markham's estimate of October 25, 2016." (Doc. No. 28 ¶ 95; Doc. No. 31-2 at 6.) Plaintiff also argues that it was forced to rely on Defendants' representations because under the policy terms, Great American unilaterally decides whether to pay under Plaintiff's claims. (Doc. No. 31-2 at 6-7.)

Specifically, in Count II, Plaintiff contends that Engle Martin acted fraudulently in the following ways:

a. Providing, on September 10, 2015, an initial estimate that did not include any code upgrade costs.

b. Stating, on October 2, 2015, that 'the code violations are not related to the fire and the reason the artists/tenants have been denied entry is not the fire, but the code issues.'

c. Stating, on October 2, 2015, that any lost income would be a direct result of the code violations and not the fire that damaged the one studio.

d. Using, in its revised estimate of February 2, 2016, a 40 percent depreciation rate instead of the 20 percent depreciation rate applied in the first estimate.

e. Using, on February 5, 2016 after Plaintiff's public adjuster pointed out the increased depreciation rate, a 33 percent depreciation rate instead of the 20 percent depreciation rate applied in the first estimate.

26

f.  Denying coverage, on July 25, 2016, under Ordinance and Law Coverage A – Undamaged Portion, while contending that 'as the undamaged parts of your building do not have to be demolished there is no loss in value to the undamaged parts of the building and Ordinance and Law Coverage A will not apply to this claim.'

g.  Denying the code upgrade claim, on September 11, 2016, on the ground that 'most, if not all of the items relate to requirements needed to secure a Certificate of Occupancy as opposed to the expenses associated with completing the fire damage repairs.'

h.  Denying the code upgrade claim, on September 11, 2016, on the ground that, 'the policy provides coverage under Ordinance or Law for cost associated with completing the repairs and does not cover the cost of complying with recommended actions or standards that exceed the actual requirements for completing the repairs.'

i.  Denying the code upgrade claim, on September 11, 2016, on the ground that Great American did not agree that there is a loss of value to the building as all of the non-compliant building components and systems existed as the time of the loss, and while the City of Philadelphia may have ordered the premises to be vacated because of these non-compliant building items, since these items existed prior to the loss, [Great American] did not see a loss of value claim for the building under Ordinance or Law – Coverage A.

(Doc. No. 28 ¶ 94.)[16]

The Federal Rules of Civil Procedure require allegations of fraud to be stated with particularity.  Fed. R. Civ. P. 9(b)[17].  The Third Circuit has construed this rule to apply to fraud actions under both federal and state law.  <u>Christidis v. First Pennsylvania Mortg. Trust</u>, 717 F. 2d

---

[16]  The allegations in sub-paragraphs 94(f) through (i) related to Great American's conduct, not Engle Martin's conduct.  As its insurer, only Great American had the authority to deny claims.  Plaintiff admits that it had no contract with Engle Martin.  (Doc. No. 28 ¶ 19.)  Therefore, in these subparagraphs, Plaintiff incorrectly alleges that Great American's allegedly fraudulent actions were attributed to Engle Martin.  Subgraphs 94(f) through (i) are copied from Paragraph 89, where Plaintiff lists Great American's alleged fraudulent actions.

[17]  Fed. R. Civ. P 9(b) provides, in relevant part: "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

96, 99 (3d Cir. 1983). Thus, in order to support a fraud claim, Plaintiff must establish with particularity that Engle Martin (1) made a misrepresentation; (2) known to be false; (3) intended to induce action; (4) that Plaintiff justifiably relied upon the misrepresentation; and (5) was damaged as a proximate result of the misrepresentation. See Devon Drive Lionville, LP, 2016 U.S. Dist. LEXIS at *43-44.

"Whether reliance on an alleged misrepresentation is justified depends on whether the recipient knew or should have known that the information supplied was false." Boardakan Rest. LLC v. Gordon Grp. Holdings, LLC, No. 11-5676, 2016 U.S. Dist. LEXIS 147298 at *45 (E.D. Pa. October 21, 2016) (quoting Fort Wash. Resources v. Tannen, 858 F. Supp. 455, 461 (E.D. Pa. 1994)). Where the means of obtaining the information in question were not equal, the representations of the person believed to possess superior information may be relied upon. Id. (citing Siskin v. Cohen, 70 A.2d 293, 295 (Pa. 1950)). In deciding whether the plaintiff justifiably relied on the information, a court may consider the degree of sophistication of the parties and the history of the negotiation process between them. Greenberg v. Tomlin, 816 F. Supp. 1039, 1056 (E.D. Pa. 1993).

Here, Plaintiff avers that Engle Martin acted fraudulently by making statements about the interpretation of the claims and the policy. Although it points out that Engle Martin changed the depreciation rate several times in revised estimates, Plaintiff does not establish that it justifiably relied on them. Importantly, Engle Martin was hired by Great American to generate an estimate after evaluating Plaintiff's claim. Acting through Cericola, Engle Martin investigated the damage, prepared an estimate, and revised it several times after incorporating Plaintiff's adjuster's estimates. (Doc. No. 28 ¶¶ 22, 36, 39, 44.) At times, Engle Martin discussed its interpretation of the claims with Plaintiff, but ultimately, Great American, not Engle Martin, decided the payout

amount, which Plaintiff initially accepted. This was an arm's length agreement based also on Plaintiff's own evaluation of the claim through the adjuster it retained.

Moreover, considering the degree of sophistication and negotiation process, Plaintiff's claim is unpersuasive for two additional reasons. First, Plaintiff disputed Great American's claim decisions throughout the course of the claim. On several occasions, Plaintiff wrote to Great American disagreeing with Engle Martin's findings. (Doc. No. 28-1 at 75-77, 90-94; Doc. No. 28-2 at 14-16.) Second, as noted, Plaintiff hired its own adjuster to represent its interest throughout the entire process. Initially, Cohen, a member of a public adjustment company, represented Plaintiff. (Doc. No. 28 ¶ 36.) Markham later took over to represent Plaintiff's interest. (Id. ¶ 51.) Plaintiff also obtained independent repair estimates from Doozer Construction, a construction company that it consulted after making its first claim. (Id. ¶ 37.) Together, these facts show that Plaintiff did not rely on Engle Martin's estimates. Instead, it obtained its own information, which Great American and Engle Martin considered when determining Plaintiff's payout amount.

Given this background, Plaintiff's means of obtaining information regarding its claims were not unequal. Further, although it disputed Engle Martin's calculations, Plaintiff willingly accepted payment of $48,682 from Great American based on Engle Martin's estimates. Thus, for all of the reasons advanced above, Count II, claiming fraud against Engle Martin, will be dismissed. Justifiable reliance has not been plausibly pled in this Count.

**2. Count III will be Dismissed Also Because Engle Martin Does Not Owe a Duty to Plaintiff.**

In Count III, Plaintiff alleges that Engle Martin was negligent by "carelessly undervaluing Plaintiff's loss, mischaracterizing the terms of the policy, and denying claims that were within the scope of the policy's coverage." (Doc. No. 31 at 7-9.) Defendants respond that, as an independent insurance adjuster, it owed no duty to Plaintiff. (Doc. No. 29-1 at 7-8.)

The parties do not dispute that Pennsylvania law applies to the negligence analysis. Because the Supreme Court of Pennsylvania has not decided the question of whether there is a cause of action for negligence against an insurance adjuster arising from the adjuster's handling of an insurance claim on behalf of the insurer, the Court must decide the dispute by "look[ing] to decisions of state intermediate appellate courts, of federal courts interpreting [Pennsylvania] law, and of other state supreme courts that have addressed the issue, as well as to analogous decisions . . . and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." Tippett v. Ameriprise Ins. Co., No. 14-4710, 2015 U.S. Dist. LEXIS 37513 at *10 (E.D. Pa. March 25, 2015) (quoting Spence v. ESAB Grp., Inc., 623 F.3d 212, 216-17 (3d Cir. 2010)) (internal citations and quotation marks omitted).

Tippett is instructive here. In that case, plaintiffs sued three insurance companies. Tippett, 2015 U.S. Dist. LEXIS 37513 at *2. Two companies, Ameriprise Insurance Company and IDS Property Casualty Company (collectively, the "Insurers") issued plaintiffs' homeowners insurance policy. Id. The third company, All American Adjusters ("All American") was hired by the Insurers, as the insurance adjuster, to evaluate plaintiffs' claim after a fire damaged their house. Id. In one count of the complaint, plaintiffs alleged that All American was negligent in preparing the dwelling loss estimate their home. In Tippett, the court noted "[t]he majority of state supreme courts to rule on the issue have determined an insured cannot bring a negligence claim against an independent insurance adjuster because an independent insurance adjuster owes the insured no duty of care." Id. (citing Trinity Baptist Church v. Bhd. Mut. Ins. Servs., LLC, 2014 OK 106, 341 P.3d 75, 82, 84-87 (Okla. 2014); Hamill v. Pawtucket Mut. Ins. Co., 179 Vt. 250, 892 A.2d 226 (Vt. 2005); Charleston Dry Cleaners & Laundry, Inc. v. Zurich Am. Ins. Co., 355 S.C. 614, 586 S.E. 2d 586 (S.C. 2003)).

Predicting that the Supreme Court of Pennsylvania would adopt the position that an adjuster owes no duty of care to an insured, the Tippett court dismissed the negligence claim, reasoning that:

> First, insureds may recover for an adjuster's torts through breach of contract and bad faith actions against their insurers. Because an insured may already recover for an adjuster's torts, imposing a duty of care on the adjuster to the insured would allow for potential double recovery from both insurer and adjuster for the same conduct. Second, imposing a duty on the adjuster to the insured could create an irreconcilable conflict between such duty and the adjuster's contractual duty to follow the instructions of its client, the insurer.

Id. (citations omitted) (alteration in original).

This Court agrees that this negligence claim should be dismissed for similar reasons. Under Pennsylvania law, insureds can sue their insurers for the actions of their insurers' agents, including adjusters. See e.g., Bruno at 106 A.3d 48 at 70 (Pa. 2014). Pennsylvania courts also recognize that independent insurance adjusters "owe a duty of performance to their principals, the insurance companies." Bleday v. OUM Grp., 645 A.2d 1358, 1363 (Pa. Super. Ct. 1994) (citing Hudock v. Donegal Mut. Ins. Co., 264 A.2d 668, 672 (Pa. 1972)). For all the above reasons, it is unlikely that the Supreme Court of Pennsylvania would impose a duty of care on adjusters to insureds. And given that this Court is required to predict the decision of the Supreme Court of Pennsylvania on this issue and having concluded that it would rule there is no duty of care owed by an insurance adjuster to the insured, Penn-Dion's negligence claim against Engle Martin in Count III of the Complaint will be dismissed.

### 3. Counts VI and VII Will Be Dismissed Because Neither Defendant Has Committed Fraud.

Counts VI and VII of the Complaint alleges civil conspiracy and concerted action under Section 879 of the Restatement (Second) of Torts. (Doc. No. 28 ¶¶ 125-150.) Both claims will be

dismissed because they rely on the fraud claims in Counts I and II, which as discussed <u>supra</u>, will also be dismissed.

### a. Civil Conspiracy

Under Pennsylvania law, to state a cause of action for civil conspiracy, the following elements are required: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of a common purpose; and (3) actual legal damage." <u>Gen. Refractories Co. v. Fireman's Fund Ins. Co.</u>, 337 F.3d 297, 313 (3d Cir. 2003) (citing <u>Strickland v. University of Scranton</u>, 700 A.2d 979 (Pa. Super. 1997)). Defendants are liable for civil conspiracy if they commit an underlying tortious act together. <u>Strickland,</u> 700 A.2d at 979. Under Pennsylvania law, when a party fails "to sufficiently allege in other counts any unlawful act of unlawful means" the conspiracy claim must also fail when it is based on these claims. <u>Boyanowski v. Capital Area Intermediate Unit</u>, 215 F.3d 396, 407 (3d Cir. 2000).

Here, Plaintiff's conspiracy claims against Great American and Engle Martin are based on fraud. It alleges "[t]he actions of Great American and Engle Martin as set forth below were done intentionally and fraudulently and thus constituted overt acts in furtherance of the tort of fraud, as pled in Count I." (Doc. No. 28 ¶ 131.) Because the Court has determined that neither Defendant has acted fraudulently, Plaintiff cannot establish that either or both Defendants conspired to do so. Therefore, Count VI will be dismissed.

### b. Concerted Action

Plaintiff claims that Defendants are liable for concerted action pursuant to the Restatement (Second) of Torts § 876 because together, they fraudulently structured the payout amount by

fluctuating the depreciation rate without explaining their reasons and refusing to reimburse the cost of construction necessary to complete code upgrades. (Doc. No. 31 at 9-10.)

The Restatement (Second) of Torts § 876 provides:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Again, Plaintiff has not sufficiently alleged facts to establish that either Defendant acted fraudulently. As discussed supra, it also has not established that Engle Martin was negligent. As noted, no duty is owed to the insured by an insurance adjuster hired by an insurance company. Therefore, Plaintiff cannot show that the conduct of one Defendant was "in concert" with the tortious conduct of the other. Accordingly, Count VII also will be dismissed.

## B. The Motion to Strike will be Denied Because the Allegations in Paragraph 84 are not Prejudicial.

Paragraph 84 alleges a violation of Pennsylvania's Unfair Insurance Practices Act ("UIPA"), which Plaintiff argues is relevant to its claim of bad faith in Count V of the Complaint. (Doc. No. 28 ¶¶ 112-124.) Specifically, it states that Defendants violated the UIPA by doing the following:

> a. Making, issuing, publishing or circulating in any manner an advertisement, announcement or statement containing any representation or statement with respect to the business of insurance or with respect to any person in the conduct of his insurance business which is untrue, deceptive or misleading. 42 P.S. 1171.1(5)(a)(2).

> b. Misrepresenting pertinent facts or policy or contract provisions relating to coverages at issue. 42 P.S. 1171.1(5)(a)(10)(i).

c. Refusing to pay claims without conducting a reasonable investigation based upon all available information. 42 P.S. 1171.1(5)(a)(10)(vi).

d. Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which the company's liability under the policy has become reasonably clear. 42 P.S. 1171.1(5)(a)(10)(vi).

e. Compelling persons to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts due and ultimately recovered in actions brought by such persons. 42 P.S. 1171.1(5)(a)(10)(vii).

f. Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application. 42 P.S. 1171.1(5)(a)(10)(viii).

(Id. ¶ 84.)

Defendants seek to strike the entire paragraph from the Complaint. Defendants contend that this allegation should be stricken because it is confusing and immaterial to Plaintiff's causes of action. They further argue that "whether or not an insurance company allegedly violated the [UIPA] is irrelevant to a determination that the insurance company violated Pennsylvania's bad faith statute." (Doc. No. 29-1 at 9.) These arguments are unpersuasive.

An allegation should be stricken pursuant to Fed. R. Civ. P. 12(f) only if it is unrelated to Plaintiff's claims and its presence is prejudicial to the movant. Fed. R. Civ. P. 12(f). Here, Defendants move to strike an allegation that they violated the UIPA, a statute that prohibits engaging in "unfair methods of competition" or "deceptive acts or practices" in the business of insurance. See 40 Pa. Cons. Stat. § 1171.4. The statute defines "unfair methods of competition" and "unfair or deceptive acts or practices" to include numerous forms of conduct. Id. at § 1171.5.

In Paragraph 84 of the Complaint, Plaintiff alleged that Defendants made deceptive, misleading or untrue statements through advertising, misrepresented facts relating to contract

provisions, refused to pay claims without conducting reasonable investigation, did not good faith attempts to effectuate equitable settlements, compelled persons to institute litigation to recover amounts due, and attempted to settle claims for less than the amount due. (Doc. No. 28 ¶ 84.) This conduct, if proven to be true, is relevant to determining bad faith.[18]

This Court has upheld that similar references to the UIPA in the context of bad faith claims. See, e.g., Macfarland v. United States Fid. & Guar. Co., 818 F. Supp. 108, 110 (E.D. Pa. 1993) (UIPA violations can be considered in determining whether an insurance company acted in bad faith); Rottmund v. Continental Assurance Co., 813 F. Supp. 1104, 1109 (E.D. Pa. 1992)("courts have looked to the rules of construction, the UIPA, and case law from other jurisdictions that recognize the tort of bad faith conduct on the part of an insurer to show that there are standards for judges to apply to determine the meaning of bad faith. . . .").

In one such case, Coyne v. Allstate Ins. Co., the plaintiff brought a similar bad faith claim against her insurance company for denying coverage of her property damage claim. 771 F. Supp. 673, 678 (E.D. Pa. 1991) Interpreting the bad faith claim, the Court noted that "[e]ven if the particular concepts encompassed within "bad faith" were not part of a common legal lexicon, the parameters of [plaintiff's bad faith claim] may be discerned by reference to analogous Pennsylvania insurance law." Id. Considering the UIPA to be similar, it stated:

> The Pennsylvania Unfair Insurance Practices Act delineates the "unfair or deceptive acts or practices" that it proscribes. Among these are:
>
> (i) Misrepresenting pertinent facts or policy or contract provisions relating to coverages at issue.

---

[18] After dismissal of Plaintiff's fraud claims (Counts I and II), its negligence claim against Engle Martin (Count III), the conspiracy claim and concerted action claims against Defendants (Count VI and VII), two claims remain: breach of contract (Count IV) and bad faith (Count V).

(ii) Failing to acknowledge and act promptly upon written or oral communications with respect to claims arising under insurance policies.

. . . . .

(iv) Refusing to pay claims without conducting a reasonable investigation based upon all available information.

. . . . .

(vi) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which the company's liability under the policy has become reasonably clear.

While the act does not specifically refer to an insurer's "bad faith," the Pennsylvania Supreme Court has utilized that term to describe conduct within the act's reach.

Id.

Therefore, the Court can consider conduct that applies to a UIPA violation when determining a bad faith claim against an insurance company. Accordingly, Paragraph 84 of the Complaint is relevant, and not prejudicial to Plaintiff's bad faith claim in Count V of the Complaint. For this reason, Defendants' Motion to Strike (Doc. No. 29) will be denied.

## V.  CONCLUSION

For the foregoing reasons, Defendants' Partial Motion to Dismiss (Doc. No. 29) will be granted in part and denied in part. Counts I, II, III, VI, and VII of the Complaint will be dismissed. Defendants Motion to Strike Paragraph 84 (Doc. No. 29) will be denied. An appropriate Order follows.